**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| Colin Sholes<br>789 S 2nd St,<br> Philadelphia, PA 19147<br><br>-And-<br><br>Carl Vernon<br>56 Burris St, Hamilton,<br>ON, L8M 2J4, Canada<br><br>-And-<br><br>Cure Consulting, LLC<br>789 S 2nd St,<br>Philadelphia, PA 19147<br><br>                Plaintiffs,<br><br>v.<br><br>Torchlight Technology Group, LLC<br>215 South Broad Street<br>10th Floor<br>Philadelphia, PA 19107<br><br>-And-<br><br>Torchlight Equity Comp, LLC<br>215 South Broad Street<br>10th Floor<br>Philadelphia, PA 19107<br><br>-And-<br><br>Matthew Morano<br>624 S American St<br>Philadelphia, PA 19147 | DOCKET NO: |

-And-

Helene Seydoux
127 Catharine St Unit 8
Philadelphia, PA 19147-3429

-And-

Andrew Guy
8133 Seminole St
Philadelphia, PA

-And-

Independence Holding Company
96 Cummings Point Road
Stamford, CT 06902-7919

                                    Defendants.

---

## CIVIL ACTION COMPLAINT

AND NOW, comes the Plaintiffs, Colin Sholes, in his individual capacity, Carl Vernon, in his individual capacity, and Cure Consulting, LLC, a limited liability company (hereinafter collectively referred to as "Plaintiffs" unless otherwise stated), by and through their undersigned Attorneys, Freundlich & Littman, LLC, and files the following Civil Action Complaint against Defendants Matthew Morano, an individual, Helene Seydoux, an individual, Andrew Guy, an individual, Torchlight Technology Group, LLC, a Limited Liability Company, and Torchlight Equity Comp, LLC, a Limited Liability Company, and Independence Holding Company, a corporation (hereinafter collectively referred to as "Defendants" unless otherwise stated), averring in support thereof as follows:

## PARTIES

1.      Plaintiff Colin Sholes is an adult individual residing at 789 S 2nd St, Philadelphia, PA 19147

2.     Plaintiff Carl Vernon is an adult individual residing at 56 Burris St, Hamilton, ON, L8M 2J4, Canada.

3.     Plaintiff Cure Consulting LLC (hereinafter "Cure"), is a limited liability company duly formed in the state of Delaware, operating in the state of Pennsylvania.

4.     Plaintiff Cure Consulting, LLC is owned and operated by Plaintiff Sholes.

5.     Defendant Torchlight Technology Group, LLC (hereinafter "TTG") is a limited liability company with its principal place of business located at 215 South Broad Street, 10th Floor, Philadelphia, PA 19107.

6.     Defendant Matthew Morano (hereinafter "Morano") is an adult individual residing at 624 S American St, Philadelphia, PA 19147.

7.     Defendant Helene Seydoux (hereinafter "Seydoux") is an adult individual residing at 127 Catharine St Unit 8, Philadelphia, PA 19147-3429.

8.     Defendant Andrew Guy (hereinafter "Guy") is an adult individual residing at 8133 Seminole St, Philadelphia, PA.

9.     At all times relevant hereto Defendants Morano, Seydoux and Guy were the principles of Defendant Torchlight Technology Group, LLC and for ease of reference will be referred to collectively as "Defendant Founders."

10.     Defendant Torchlight Equity Comp, LLC (hereinafter "EC") is a limited liability company with its principal place of business located at 215 South Broad Street, 10th Floor, Philadelphia, PA 19107.

11.     Defendant Independence Holding Company (hereinafter " IHC")  is a corporation with its principal place of business located at 96 Cummings Point Road, Stamford, CT 06902-7919.

## JURISDICTION

12.     Plaintiffs hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

13.     This Court has subject matter jurisdiction over the Plaintiffs' Copyright Infringement Claims pursuant to 28 U.S.C. § 1331.

14.     This Court has supplemental jurisdiction over the Plaintiffs' state law claims purusnt to 28 U.S.C §1367(a).

15.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and/or that the parties contractually agreed to the selection of this judicial district as the appropriate venue for this within civil action.

## INTRODUCTORY BACKGROUND

16.     On or about April 9, 2013, Plaintiff Vernon and Plaintiff Sholes formed Plaintiff Cure.  Plaintiff Cure is a consulting company that specializes in computer technology that creates software solutions to fit the specific needs of their clients.

17.     Plaintiff created numerous software programs.

18.     One such type of software created by Plaintiffs was a software application called Global ID.

19.     Global ID was created on or about January 10, 2017, by Plaintiffs and part of Plaintiff Cure's software IP.

20.     Global ID is invaluable in that it is a serverless application which allows a company to track the value of individual leads over time. A would be customer is assigned a unique identifier when they enter the ecosystem, then costs and revenue of further marketing

(sms, email, calls, etc) are tracked throughout their journey. This allows for tracking the true lifetime value of each customer, as well as powering reporting for campaign profitability and machine learning initiatives.

21.     Global ID was created by Plaintiff and Plaintiff Cure holds a copyright bearing registration number TX 8-935-194 to the same. A true and correct copy of Plaintiff Cure's copyright is attached hereto as Exhibit "A".

22.     This copyright states in unambiguous terms that Plaintiff Cure owns the Code For Global ID ("GLID")…." See Exhibit "A".

23.     On or about 2014, Plaintiffs began working with Defendant TTG in a consulting capacity creating and licensing various software systems for TTG.

24.     These software systems included but were not limited to Health_Track, Ladman, Grok, Rover, Slinky, Chattio, Ledge, Cpcman and Global ID.

25.     Defendant TTG was a data lead broker, a company designed to sell web based leads to companies.

26.     Defendant TTG had no direct advertising or reporting software which would have allowed them to track and analyze the web activity of consumers to later sell to companies as consumer "leads" or people interested in products or services.

27.     Accordingly, Defendant TTG, through its founders, sought out the services of Plaintiffs to create software programming and marketing materials for this purpose.

28.     Defendant TTG would pay a licensing fee in the form of a profit share to Plaintiffs in return for the use of computer software and advertisements that they developed to fit the company's needs.

29.     Ultimately, it was the Plaintiffs who created the vast majority of Defendant TTG's data reporting infrastructure,

30.     Plaintiffs at all times retained the intellectual property of the software licensed to Defendant TTG.

31.     As Defendant TTG began to rely more on the Plaintiffs software, Defendant TTG sought to employ Plaintiff Sholes and Plaintiff Vernon.

32.     Plaintiff Sholes and Vernon refused to work exclusively with TTG unless Plaintiffs were allowed to retain the IP to the software, they had created prior to their employment with TTG and unless they were given shares in the company.

33.     Plaintiff Sholes and Vernon knew that they had already created valuable software which could otherwise be licensed for use by other potential clients.

34.     It was clear that Defendants sought to use Plaintiffs' software exclusively and build programming on the software and IP created by Plaintiffs.

## PROPRIETARY INFORMATION, COMPETITION, AND INVENTIONS ASSIGNMENT AGREEMENT WITH EXHIBIT

35.     In April of 2017, Defendant Founders began multiple talks concerning how Plaintiffs would be compensated for their contribution.

36.     Defendant Founders knew that Plaintiff Vernon and Plaintiff Sholes would not agree to work for Defendant TTG unless they were given equity in Defendant TTG.

37.     In fact, Defendant Founders during numerous conversations highlighted how Defendant TTG and Plaintiffs would profit from sale of Defendant TTG since they were using Plaintiffs software.

38.     To entice Plaintiffs into allowing Defendant TTG exclusive use of their software, Defendant TTG and Defendant Founders promised to Plaintiffs shares in Defendant TTG, with the understanding that they would receive a large distribution should Defendant TTG be sold.

39.     In order to accomplish this, Defendant Founders explained that they would create an entity that would allow Plaintiffs to obtain equity in the proceeds from the sale of Defendant TTG.

40.     Defendant Founders notified Plaintiffs that they had created Defendant TEC which would hold the proceeds from any sale of Defendant TTG.

41.     On or about May 30, 2017, Plaintiff Sholes was made to sign an agreement entitled Proprietary Information, Competition, And Inventions Assignment Agreement (hereinafter the "Proprietary Agreement").  A true and correct copy of the Plaintiff Sholes's Proprietary Agreement is attached hereto as Exhibit "B."

42.     The agreement laid out in detail what was considered Defendant TTG's Proprietary Information but also that all the software and IP created by Plaintiffs would be retained by the Plaintiffs. See Exhibit "B".

43.     The agreement makes clear that Plaintiffs would retain the IP which was created prior to his employment with Defendant TTG, specifically stating:

> (j) Exhibit. I acknowledge that there are no currently existing ideas, processes, inventions, discoveries, marketing or business ideas or improvements which I desire to exclude from the operation of this Agreement, unless a reference thereto has been included on Exhibit A attached hereto. To the best of my knowledge, there is no other contract to assign inventions, trademarks, copyrights, ideas, processes, discoveries or other intellectual property that is now in existence between me and any other person
> (including any business or governmental entity).
>
> Exhibit A

A.      Inventions made by me prior to my employment or service with the Company that I desire to be excepted from the Agreement to which this Exhibit A is attached (if none, write "NONE"):

> Reporting and tracking software used by Cure Consulting / AdSolve which interfaces with Torchlight's systems (including by not limited to – health_track, rover, grok, ladman)
>
> All holdings, assets, and IP of SSRP Ventures and any advertising and marketing done on their behalf
>
> All holdings, assets, and IP of Cure Consulting and any advertising and marketing done   on their behalf
>
> All holdings, assets, and IP of Identity Protect and any advertising and marketing done on their behalf
>
> B.   Prior agreements to which I am a party that may interfere with full compliance with the Agreement to which this Exhibit A is attached (if none, write "NONE"):
>
> Cure Consulting operating agreement & all present and future contracts associated with the company

See Exhibit "B"

44.     On or about May 2, 2017, Plaintiff Vernon was made to sign an agreement entitled Proprietary Information, Competition, And Inventions Assignment Agreement (hereinafter the "Vernon's Proprietary Agreement").  A true and correct copy of the Plaintiff Vernon's Proprietary Agreement is attached hereto as Exhibit "C."

45.     The Vernon's Proprietary Agreement makes clear that Plaintiff Vernon was working for Plaintiff Cure before and at the time of signing. See Exhibit "C"

46.     As mentioned above, as additional consideration for signing both Plaintiff Sholes and Plaintiff Vernon were each to receive 9% equity in Defendant TTG.

47.    Defendant Founders represented to Plaintiff Sholes and Plaintiff Vernon that they would retain this equity and get compensation for the use of their software by TTG should TTG be sold.

48.    In June of 2017, Defendant held a meeting with Plaintiff Vernon and Plaintiff Sholes and other Defendant TTG employees.

49.    In order to receive equity, Defendant TTG employees were told that they had to sign the Proprietary Information, Competition, And Inventions Assignment Agreements which had been given to Plaintiffs Sholes and Vernon.

50.    At all times Defendant Founders highlighted that Defendant TTG had the goal of selling the company and that TTG employees and Plaintiffs would greatly benefit from this sale by participating in Defendant TEC equity.

51.    Defendants knew that this would entice TTG employees as well as Plaintiffs to work and put in extra efforts for the benefit of Defendant TTG.

52.    During one of the TEC meetings, shares were distributed to members of Defendant TEC.  Plaintiffs and TTG employees were again told that should there be a liquidity event, such as the selling of the company, the proceeds would go to Defendant TEC and all share owners would be paid out equally, Defendants Seydoux and Morano and Guy included.

53.    In order to promote transparency, Plaintiff Sholes, Plaintiff Vernon, Defendant Morano and Defendant Seydoux created a cap table formula, wherein new hires would be added to the TEC equity Comp vehicle after a year of employment, and everyone's shares would be adjusted according to their percentage.

54.    Both Plaintiff Sholes and Vernon received 9% shares of equity.

55.     On or about February of 2019, the three Founding Defendants bought out the fourth owner of Defendant TTG, Matt Mereghetti, who owned 25% of TTG equity.

56.     On or about June of 2019, Defendant IHC bought a 23% stake in TTG for approximately $2 million dollars.

57.     Plaintiffs and TEC members did not receive any income as a result of Defendant IHC's purchase of the 23% company stake.

58.     Instead, Defendant Morano told Plaintiff Sholes that the money from Defendant IHC's investment would not be distributed to the TEC members, because one of Defendants alleged conditions of investment was that the money had to stay in the TTG company.

59.     Defendant Morano and Defendant Seydoux also explained to Plaintiff Sholes that they were unable to pay themselves with the money invested by Defendant IHC either.

60.     In December of 2019, Plaintiff Sholes and Vernon received a payment of $4,495 from Defendant TEC categorized as a "profit share" distribution.

61.     Defendants never explained the calculation behind this distribution or exactly what the distribution represented.

62.     In the multi-year existence of Defendant TEC, this was to be the only payment ever made out to Plaintiff Sholes and Plaintiff Vernon.

63.     On or about February of 2020, Defendant Morano informed Plaintiff Sholes that he was negotiating with Defendant IHC for them to fully buyout the remaining shares of Defendant TTG indicating that there would be a payout to Plaintiff Sholes along with the rest of the TEC members upon completion of the purchase.

64.     In April of 2020, Defendant IHC purchased the remaining equity in Defendant TTG.

65.     It is believed and averred the purchase price was $15,000,000.00

66.     It is believed and averred Defendants Morano, Seydoux and Guy received additional compensation packages in addition to the purchase price.

67.     In celebration, Defendant Morano, held a 'blow-out' party at his house in which TTG employees and Defendant Seydoux were present.

68.     During the celebration, both Defendant Morano and Defendant Seydoux told Plaintiff Sholes that "this will be good for all of us."  Plaintiff Sholes was repeatedly also told how much Defendant TTG and Defendant IHC valued his work.

69.     Unbeknownst to Plaintiff Sholes, Plaintiff Vernon or any of the other TEC members, Defendants had inappropriately dissolved TEC.

70.     On or about April 17, 2020, instead of receiving proceeds from their equity shares, Plaintiff Sholes, Plaintiff Vernon and other TEC members were told that they could only continue their employment at this point if they signed new employment contracts.

71.     For weeks Plaintiffs and TEC members questioned Defendants about the proceeds from the sale, but Defendants refused to discuss the proceeds of the sale for TEC members until the new employment agreements were signed.

72.     On or about April 20, 2020, following the signing of the new employment agreements, Defendants Morano and Seydoux informed Plaintiff Vernon, Plaintiff Sholes and the TEC members that there would be "no money" and no payments made from the sale of TTG.

73.     Defendants explanation was that added expenses and taxes made the sale unprofitable, and that Defendants "weren't getting much."

74. Defendants then informed Plaintiff Sholes, Plaintiff Vernon and TEC members for the first time, that TEC was "just for bonuses," indicating that there was never going to be an actual equity-based payout.

75. At one point during the meeting, TEC member, Kyle Feeley, directly asked Defendants why they had lied about the value of the company and Defendant Seydoux admitted that TEC was worthless.

76. The next day Defendant Morano retaliated against Kyle Feeley by yelling at him in public and calling him obscenities, the result of which led to Defendant Morano's termination.

77. In July of 2020, Plaintiff Sholes, Plaintiff Vernon and TEC members informed IHC about the fraudulent claims and misrepresentations made by Defendant Morano and Defendant Seydoux with respect to TTG's sale, but IHC refused to do anything.

78. To this date, Plaintiff Sholes has not received any proceeds from the sale of TTG

79. To this date, Plaintiff Vernon has not received any proceeds from the sale of TTG

80. To this date, Defendants continue to use Plaintiff Cure's software and IP and its derivatives without permission to do so.

81. To this date, Defendants continue to use Plaintiff Cure's registered and copyrighted software in violation of the code.  See Exhibit "A'.

82. Defendants have stolen and misappropriated Plaintiffs software and IP to the severe financial detriment of Plaintiffs.

83. Plaintiffs file the instant action as a measure of last resort.

## COUNT I
## DECLARATORY JUDGMENT
### Plaintiff Sholes v. All Defendants

84.   Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

85.   This Count is brought pursuant to the Declaratory Judgment Act, 42 Pa. C.S.A. § 7531 and Pa.R.C.P. 1602, asking this Court to interpret the Management Agreement and construe its validity under the Declaratory Judgment Act, Specifically 42 Pa. C.S.A § 7533.

86.   A declaratory judgment may be obtained as to the interpretation of a document and as to the rights of the parties under it. County Amusement Co. Johnstown Schiff's, Inc., 37 Pa. S. & C.2d (C.P. 1965).

87.   A more appropriate or available and established remedy is not available for the Plaintiff Sholes without the Court first interpreting the Parties' rights pursuant to the Management Agreement.

88.   Furthermore, declaring that the Plaintiff Sholes's Proprietary Agreement is a valid and enforceable agreement will help prevent Plaintiff from suffering further harm.

89.   As stated above, Defendants have breached their obligations pursuant to the Proprietary Agreement and continue to operate the business using Plaintiffs illegally and improperly retained software and IP without Plaintiffs' permission.

WHEREFORE, Plaintiff Sholes respectfully requests that this Honorable Court find Plaintiff Sholes's Proprietary Agreement to be a valid and enforceable document.

## COUNT II
## WILLFUL BREACH OF CONTRACT
### Plaintiff Sholes v. Defendant TTG, Defendant TEC & Defendant Founders

90.     Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

91.     As mentioned above, on May 7, 2017, Plaintiff Sholes entered into a Proprietary Agreement with Defendant TTG.

92.     As mentioned above, it was stated in unambiguous terms, that Plaintiff Sholes was to retain, "reporting and tracking software used by Cure Consulting / AdSolve which interfaces with Torchlight's systems (including by not limited to – health_track, rover, grok, ladman)" and other IP laid out in Exhibit A of Plaintiff Sholes' Proprietary Agreement. See Exhibit "B".

93.     At all times relevant hereto, Plaintiff Sholes acted in accordance with his terms of this agreement.

94.     At all times relevant hereto, Plaintiff Sholes while in the employ of Defendant TTG forwent both money and opportunities he would have otherwise had to lease the aforementioned software to other clients.

95.     Plaintiff Sholes relied on the Proprietary Agreement and on the representations made by Defendants in that he believed he would retain the software rights and be adequately compensated for the same.

96.     Plaintiff Sholes relied on the Proprietary Agreement and on the representations made by Defendants in that he was led to believe that should Defendant TTG sell the company while using his software he would receive equity in the company for the sale of the same.

97.     Rather than abide by the terms of Plaintiff Sholes's Proprietary Agreement, Defendants stole and misappropriated Plaintiff Sholes's software.

98.     Worse, it is believed and therefore averred, that Defendant TTG retained this software and intentionally pushed Plaintiff Sholes out of any equity he would otherwise receive in the sale of Defendant TTG.

99.     Contrary to the terms of Plaintiff's Proprietary Agreement, Defendants continue to use Plaintiffs' software and IP without the license to do so.

100.     As a direct result of Defendants breach Plaintiff has suffered and will continue to suffer large monetary damages.

101.     Plaintiff Sholes' Property Agreement dictates that the prevailing party be entitled to attorneys' fees and costs. See Exhibit "A".

WHEREFORE, Plaintiff Sholes respectfully demands judgment in his favor against the Defendants in an amount in excess of $75,000.00, plus interest, costs, attorneys fees and any other relief that this Honorable Court deems just and appropriate.

**COUNT III**
**BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING**
**Plaintiff Sholes v. Defendant TTG, Defendant TEC & Defendant Founders**

102.     Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

103.     In all contracts exist a duty of Good faith and fair dealing.

104.     As mentioned above, on May 7, 2017, Plaintiff Sholes entered into a Proprietary Agreement with Defendant TTG.

105.     As mentioned above, it was stated in unambiguous terms, that Plaintiffs Sholes was to retain, "reporting and tracking software used by Cure Consulting / AdSolve which

interfaces with Torchlight's systems (including by not limited to – health_track, rover, grok, ladman)" and other IP laid out in Exhibit A of Plaintiff Sholes' Proprietary Agreement. See Exhibit "B".

106.    At all times relevant hereto, Plaintiff Sholes acted in accordance with his terms of this agreement.

107.    At all times relevant hereto, Plaintiff Sholes while in the employ of Defendant TTG forwent both money and opportunities he would have otherwise had to lease the aforementioned software to other clients.

108.    Plaintiff Sholes relied on the Proprietary Agreement and on the representations made by Defendants in that he believed he would retain the software rights and be adequately compensated for the same.

109.    Plaintiff Sholes relied on the Proprietary Agreement and on the representations made by Defendants in that he was led to believe that should Defendant TTG sell the company while using his software he would receive equity in the company for the sale of the same.

110.    Rather than abide by the terms of Plaintiff Sholes' Proprietary Agreement, Defendants stole and misappropriated Plaintiff Sholes's software.

111.    Worse it is believed and therefore averred, that Defendant TTG retained this software and intentionally pushed Plaintiff Sholes out of any equity he would otherwise receive in the sale of Defendant TTG.

112.    Contrary to the terms of Plaintiff's Proprietary Agreement, Defendants continue to use Plaintiffs software and IP without the license to do so.

113.    As a direct result of Defendants breach Plaintiff has suffered and will continue to suffer large monetary damages.

114.    Defendants have not acted in good faith and have willfully breached Plaintiff Sholes's Agreement by exploiting and profiting from Plaintiff Sholes' software and IP while also pushing Plaintiff Sholes out of the company in an effort to steal Plaintiff's software and not pay him what he is entitled to under the terms of the agreement and in accordance the law.

WHEREFORE, Plaintiff Sholes respectfully demands judgment in his favor against the Defendants in an amount in excess of $75,000.00, plus interest, costs, attorneys' fees and any other relief that this Honorable Court deems just and appropriate.

**COUNT IV**
**UNJUST ENRICHMENT; QUANTUM MERUIT**
**Plaintiffs Sholes and Cure Consulting, LLC v. Defendants**

115.    Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

116.    As mentioned above, on May 7, 2017, Plaintiff Sholes and Cure Consulting, LLC entered into a Proprietary Agreement with Defendant TTG.

117.    As mentioned above, it was stated in unambiguous terms, that Plaintiff Sholes was to retain, "reporting and tracking software used by Cure Consulting / AdSolve which interfaces with Torchlight's systems (including by not limited to – health_track, rover, grok, ladman)" and other IP laid out in Exhibit A of Plaintiff Sholes' Proprietary Agreement. See Exhibit "B".

118.    At all times relevant hereto, Plaintiffs acted in accordance with his terms of this agreement.

119.    At all times relevant hereto, Plaintiff Sholes while in the employ of Defendant TTG forwent both money and opportunities he would have otherwise had to lease the aforementioned software to other clients.

120.     Defendants have retained the benefit of all Plaintiffs' software and IP without having compensated Plaintiffs

121.     Accordingly, Defendants have been unjustly enriched in an amount in excess of $75,000.00.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor against the Defendants in an amount in excess of $75,000.00, plus interest, costs, and any other relief that this Honorable Court deems just and appropriate.

## COUNT V
## FRAUD IN THE INDUCEMENT
### Plaintiffs v. Defendant TTG, Defendant TEC & Defendant Founders

122.     Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

123.     As laid out above, in order to get access to Plaintiffs software and intellectual property, Defendants created an entity TEC and represented to Plaintiffs that they were now equity holders in the company.

124.     Defendants made representations that Plaintiffs would share in any sale of the company.

125.     In fact, Defendants had no intention in giving Plaintiffs any equity in the company.

126.     In fact, Defendants created this company to deceive Plaintiffs into believing that they would be shareholders receiving a payout.

127.     Based on these fraudulent representations, Plaintiffs agreed to continue to work with Defendants allowing them to use their intellectual property and software.

128.     If the Plaintiffs had known that Defendants tactics was merely a ruse, they would

not have agreed to allow Defendants to use their intellectual property and software.

129.     In short, Defendants made a false statement of material fact that they knew was

false, made it for the purpose of inducing Plaintiffs reliance, to which Plaintiffs did in fact rely.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor against the

Defendants in an amount in excess of $75,000.00, plus interest, costs, punitive, treble damages

and any other relief that this Honorable Court deems just and appropriate.

**COUNT VI**
**BREACH OF FIDUCIARY DUTIES**
**Plaintiffs v. Defendant TTG, Defendant TEC & Defendant Founders**

Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set

forth at length herein.

130.     As mentioned above, Plaintiff Sholes and Vernon and Defendants Morano,

Seydoux and Guy entered into an Agreement.

131.     As partners of the company, Defendants Morano, Seydoux and Guy owed

fiduciary duties of care loyalty, and good faith to Sholes and Vernon.

132.     Defendant Founders had fiduciary duties of loyalty and good faith,

included to:

> (a) protect and maximize Plaintiffs' assets and engage in business to maximize
>
> TEC and TTG and its shareholders' and members' value;
>
> (b) operate TEC and TTG in its best interests, and not to subordinate its interest to
>
> the interests of the Founders or other companies which Founders owned or
>
> controlled;

(c) operate TEC and TTG in a fiduciary manner to maximize its and its shareholders' and

members' value, and not to harm TEC and TTG and Plaintiffs as a shareholders and member;

(d) maximize shareholder and member value and to not engage in waste, such as direct or indirect payments to themselves that are unfair to TEC and TTG;

(e) keep all shareholders and members adequately informed of all material developments and to schedule annual shareholder and members meetings as required by law;

(f) maintain accurate and complete shareholder, member and financial records;

(g) avoid self-dealing transactions that are not approved by disinterested shareholders or members and that are fair to TEC and TTG.

133.   Defendant Founders duties to Plaintiff Sholes and Vernon include, but are not limited to, obligations to exercise good business judgment to act prudently in the operation of the company's business, to discharge their actions in good faith, to act in the best interests of the company, and to put the interests of the company before their own.

134.   Defendant Founders breached their fiduciary duties of care by, among other things dissolving TEC and squeezing Plaintiffs Sholes and Vernon out of the deal and misappropriating their software.

135.   Defendants intentionally orchestrated a minority squeeze out of Plaintiff's interest in TEC and TTG.

136.   Plaintiffs Sholes and Vernon have been damaged and continue to be harmed by Defendant Founders breach of their fiduciary duties.

WHEREFORE, Plaintiffs Sholes and Vernon respectfully requests that this Honorable Court enter an Order requiring dissolution of the founders' shares and liquidation of all assets.

## COUNT VII
## FRAUD; CONVERSION, THEFT AND EMBEZZLEMENT
### Plaintiff Sholes and Plaintiff Vernon
### v.
### Defendant Founders, Defendant TTG and Defendant TEC

137.    Plaintiffs hereby incorporate the preceding paragraphs by reference as though fully set forth at length herein.

138.    As mentioned above, in order to induce Plaintiffs to work for Defendant TTG and in order to have exclusive use to Plaintiffs' software and IP, Defendants promised Plaintiff equity in Defendant TTG

139.    As mentioned above, Plaintiff Vernon and Plaintiff Sholes were promised 9% equity of Defendant TTG and would share in the profit from a sale in the future.

140.    Accordingly, Plaintiff Vernon and Plaintiff Sholes were given 9% equity in Defendant TEC which Founding Defendants represented would consist of these profits.

141.    Defendants never planned on giving Plaintiffs equity in the sale proceeds of TTG.

142.    Defendants continually led Plaintiffs to believe that they would be receiving compensation from any liquidity event for TTG.

143.    Plaintiff Sholes and Plaintiff Vernon relied on these representations and in turn allowed TTG to exclusively use software they developed and worked exclusively at TTG based on Defendants false representations.

144.    Instead, it is believed, and therefore averred, that the Defendant Founders, TTG and TEC converted this money for themselves at the detriment of Plaintiffs.

145.    As a direct and proximate result of this conversion, Plaintiffs have suffered substantial damages.

146.    Defendants actions have been willful and outrageous and undertaken with reckless indifference to the rights of Plaintiffs.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor against the Defendants in an amount in excess of $75,000.00, plus interest, costs, compensatory and punitive damages and any other relief that this Honorable Court deems just and appropriate.

## ACCOUNTING
### Plaintiffs Sholes and Vernon v. Defendant TTG and Defendant TEC

147.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs, as if fully set forth herein.

148.    As mentioned above, Plaintiff Sholes and Plaintiff Vernon have equity interest of 18% in Defendant TEC and ownership interests in the software being inappropriately used by Defendant TTG.

149.    As equity owners, Plaintiff Sholes and Plaintiff Vernon are owed certain fiduciary duties from the Defendants.

150.    Among those duties is the duty to receive an accounting on demand pursuant to the Pennsylvania limited liability rules and regulations.

151.    Plaintiffs request an accounting be ordered.

WHEREFORE, Plaintiffs respectfully request this Court order an accounting of Defendant TTG and Defendant TEC.


[This part of the page has been intentionally left blank]

## COUNT IX
## CIVIL CONSPIRACY
### Plaintiffs v. Defendant TEC, Defendant Founders, and Defendant TTG

152.    The averments of the foregoing paragraphs are incorporated by reference herein with the same force and effect as if set forth in full below.

153.    Defendant TEC, Defendant Founders, and Defendant TTG acted together by agreement and course of action in a conspiracy with the purpose to violate state and federal law and to harm Plaintiffs.

154.    Defendant TEC, Defendant Founders, and Defendant TTG actions were the proximate cause of damage to Plaintiffs.

155.    The unlawful actions of the Defendants/co-conspirators are continuing and should be enjoined.

156.    The actions of the co-conspirators were willful and malicious and warrant the imposition of punitive damages.

WHEREFORE, as a result of Defendants conspiracy, Plaintiffs respectfully demand judgment against Defendant TEC, Defendant Founders, and Defendant TTG, jointly and severally, and prays for relief as follows: i) actual and compensatory damages in an amount well in excess of $75,000 to  compensate Plaintiffs for the past, present and future harm it has sustained and will sustain as a result of Defendants wrongful conduct; ii) an accounting of all revenues and profits that Defendants, and all persons aiding or acting in concert with them, have derived from their unlawful scheme; iii) damages sufficient to deprive Defendants of any unjust benefit or enrichment from their wrongful conduct; iv) a permanent injunction barring Defendants from continuing to misappropriate, possess and use Plaintiffs confidential and proprietary information; v) punitive damages in an amount to be determined at trial but sufficient

to punish Defendants for their intentional, willful and wanton conduct; vi) Plaintiffs costs, disbursements and attorney's fees incurred in prosecuting this action; and vii) such other and further relief as the Court may deem just, proper and equitable.

### COUNT X
### COPYRIGHT INFRINGEMENT
### Plaintiffs v. All Defendants

157.    Plaintiffs hereby repeat and incorporate by reference all preceding paragraphs of this Complaint as if fully restated herein.

158.    Global ID and its derivative programming is registered with the U.S. Copyright Office and copyright protected pursuant to the Copyright Act of 1976 the Copyright Act), which was amended in 1980 17 U.S.C. 101 et seq.) expressly to extend copyright protection to computer programs and derivatives which are entitled to copyright protection as literary works. See e.g., Whelan Assoc, v. Jaslow Dental Lab., 797 F. 2d 1222, 1235 3d Cir. 1986).

159.    The aforementioned copyrighted works carry copyright notices visible to all users.

160.    The aforementioned copyrighted works are the product of a substantial degree of creativity, is original to, and independently created by Plaintiffs and are protected by a valid copyright.

161.    As described above, Defendants have knowingly infringed upon the aforesaid copyrighted works by their malicious, fraudulent, deliberate and/or willful acts.

162.    The above-described malicious, fraudulent, deliberate and/or willful conduct of Defendants has caused and continues to cause Plaintiffs to suffer irreparable harm, the full extent of which cannot be readily determined at this time.

163.    Unless and until Defendants are enjoined from any and all further use, distribution, marketing, and display of copied or derivative material, Plaintiffs will continue to be irreparably harmed.

164.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully demand the following equitable and legal relief against Defendants:

a.    That Defendants, and their agents, and servants, be enjoined from infringing upon the aforementioned copyrighted materials in any manner. 17 U.S.C. 502;

b.    That Defendants, and their agents, and servants, be required to destroy any and all infringing copies of copied or derivative material in their possession and/or control 17 U.S.C. 503;

c.    That damages be awarded against Defendants for the actual damages suffered by Plaintiffs as a result of the infringement, and for disgorgement of profits derived by Defendants as a result of the infringement, or, at Plaintiffs election, an award of statutory damages for the infringement of each copyrighted work of Plaintiffs 17 U.S.C. 504;

d.    That Defendants, and their agents, and servants, be required to supply for examination a complete, functional copy of the derivative software;

e.      That Defendants, and their agents, and servants, be held jointly and severally liable for Plaintiffs attorneys' fees and costs 17 U.S.C. 505); and

f.      That any and all such further damages as this Court deems appropriate be granted, including injunctive, equitable and/or legal relief.

## COUNT XI
## PERMANENT INJUNCTION
### Plaintiffs v.  All Defendants

165.    The averments of the foregoing paragraphs are incorporated by reference fully set forth herein.

166.    By virtue of the foregoing, Plaintiffs have demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

167.    Unless the Defendants are permanently enjoined from the foregoing conduct, Plaintiffs will be irreparably harmed by:

a.      Disclosure of trade secrets, proprietary business and other confidential information which are solely the property of Plaintiffs;

b.      Loss of customers, loss of goodwill, and loss of business reputation;

c.      Past, present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

168.   Plaintiffs have no adequate remedy at law.

169.   As set forth above, Defendant TTG Contractually agreed that Plaintiffs have no adequate remedy at law and that they are entitled to injunctive relief.

WHEREFORE, Plaintiffs respectfully request that:

a.   Defendants be permanently enjoined from the use of any and all of Plaintiffs software and intellectual property.

b.   That Defendants, and their agents, and servants, be required to destroy any and all infringing copies of copied or derivative material in their possession and/or control 17 U.S.C. 503;

c.   That damages be awarded against Defendants for the actual damages suffered by Plaintiffs as a result of the infringement, and for disgorgement of profits derived by Defendants as a result of the infringement, or, at Plaintiffs election, an award of statutory damages for the infringement of each copyrighted work of Plaintiffs 17 U.S.C. 504;

d.   That Defendants, and their agents, and servants, be required to supply for examination a complete, functional copy of the derivative software;

e.   That Defendants, and their agents, and servants, be held jointly and severally liable for Plaintiffs attorneys' fees and costs 17 U.S.C. 505); and

f.   That any and all such further damages.

### COUNT XII
### UNFAIR COMPETITION
### Plaintiffs v. Defendants

170.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

171.    Plaintiffs have the right to be free from unfair competition caused by the unlawful misappropriation and misuse of their confidential and proprietary business information.

172.    By their conduct described above, the Defendants have and will continue to compete unfairly against Plaintiffs.

173.    By stealing, disclosing and misusing Plaintiffs confidential and proprietary information, by taking advantage of that information in competition with Plaintiffs the Defendants have gained unfair competitive advantages over Plaintiffs.

174.    Plaintiffs have no adequate remedy at law by which to prevent Defendants from unfairly competing against them and money damages alone cannot compensate Plaintiffs for the harm caused by Defendants unfair competition.

175.    Defendants concerted egregious unfair competition, coupled with the other unlawful conduct described herein, warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against all Defendants, jointly and severally, and prays for relief as follows:

  a. Actual and compensatory damages;

  b. An accounting of all revenues and profits that Defendants and all persons aiding or acting in concert with them, have derived from their unlawful scheme;

c.  A permanent injunction barring Defendants from continuing to misappropriate, possess and use Plaintiffs confidential and proprietary information;

d.  Punitive damages;

e.  Costs, disbursements and attorneys' fees; and

f.  Such other and further relief as the Court may deem just, proper and equitable.


**FREUNDLICH & LITTMAN, LLC**


BY: _____

David S. Jaffe, Esquire
Gregory C. Littman, Esquire
Austin R. Freundlich, Esquire
1425 Walnut Street
Suite 200
Philadelphia, PA 19102
215-545-8500
215-545-8510

# **<u>EXHIBIT A</u>**

**Registration #:** TX0008935194
**Service Request #:** 1-10158742371

## Mail Certificate

The Plus IP Firm
101 NE 3rd Ave.
Suite 1500
Fort Lauderdale, FL 33301 United States

**Priority:** Special Handling    **Application Date:** February 16, 2021

## Correspondent

**Organization Name:** The Plus IP Firm
**Name:** Derek Fahey
**Email:** derek@plusfirm.com
**Telephone:** (954)547-7634
**Alt. Telephone:** (954)332-3584
**Address:** 101 NE 3rd Ave.
SUITE 1500
Fort Lauderdale, FL 33301 United States

**Registration Number**

# TX 8-935-194

**Effective Date of Registration:**
February 16, 2021
**Registration Decision Date:**
February 17, 2021

## Title _____

Title of Work: Code For Global ID ("GLID")

## Completion/Publication _____

Year of Completion: 2017
Date of 1st Publication: January 10, 2017
Nation of 1st Publication: United States

## Author _____

- **Author:** Carl Vernon
 **Author Created:** computer program
 **Work made for hire:** No
 **Citizen of:** Canada
 **Domiciled in:** Canada
 **Year Born:** 1982

- **Author:** Colin Sholes
 **Author Created:** computer program
 **Work made for hire:** No
 **Citizen of:** United States
 **Domiciled in:** United States
 **Year Born:** 1980

## Copyright Claimant _____

Copyright Claimant: Cure Consulting, LLC
789 South 2nd Street, Philadelphia, PA, 19147, United States
Transfer statement: By written agreement

## Rights and Permissions _____

**Organization Name:** The Plus IP Firm
Derek Fahey
**Email:** derek@plusfirm.com
**Telephone:** (954)332-3584
**Address:** 101 NE 3rd Ave.
Suite 1500
Fort Lauderdale, FL 33301 United States

## Certification

**Name:** Derek Fahey
**Date**: February 16, 2021

**<u>EXHIBIT B</u>**

# PROPRIETARY INFORMATION, COMPETITION, AND INVENTIONS ASSIGNMENT AGREEMENT

This revised PROPRIETARY INFORMATION, COMPETITION, AND INVENTIONS ASSIGNMENT AGREEMENT (the "Agreement") is made between Torchlight Technology Group, LLC (the "Company") and the undersigned employee or consultant.

In consideration of my participation in the Company's equity compensation program, the receipt of confidential information while associated with the Company, and other good and valuable consideration, intending to be legally bound, I, the undersigned individual, agree that:

1. <u>Term of Agreement</u>.  This Agreement shall continue in full force and effect for the duration of my employment with or service to the Company (whether before or after the date of this Agreement, the "Engagement") and shall continue thereafter as otherwise provided in this Agreement.

2. <u>Confidentiality</u>.

(a) <u>Definitions</u>.  "Proprietary Information" is all information and any idea in whatever form, tangible or intangible, pertaining in any manner to the business of the Company or any of its Affiliates (defined as any subsidiaries or affiliates of the Company that directly or indirectly control, are controlled by, or are under common control with the Company), or its employees, clients, consultants, or business associates, which was produced by any employee or consultant of the Company in the course of his or her employment or consulting relationship or otherwise produced or acquired by or on behalf of the Company. All Proprietary Information not generally known outside of the Company's organization, all Proprietary Information so known only through improper means and any information received by the Company from third parties that is subject to confidentiality obligations, is competitively sensitive and shall be deemed "Confidential Information."   By example and without limiting the foregoing definition, Proprietary and Confidential Information shall include, but not be limited to:

(1) formulas, research and development techniques, processes, trade secrets, including but not limited to Torchlight Technology Group's proprietary programs, computer programs, software, electronic codes, mask works, inventions, innovations, patents, patent applications, discoveries, improvements, data, know-how, formats, test results, and research projects;

(2) information about costs, profits, markets, sales, contracts and lists of customers, and distributors;

(3) business, marketing, and strategic plans;

(4) forecasts, unpublished financial information, budgets, projections, and customer identities, characteristics and agreements; and

(5) employee personnel files and compensation information.

Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company. Confidential Information shall be covered by this Agreement whether it is received by the undersigned employee or consultant before or after the date of this Agreement.

(b) Existence of Confidential Information. The Company owns and has developed and compiled, and will develop and compile, certain trade secrets, proprietary techniques and other Confidential Information which have great value to its business. This Confidential Information includes not only information disclosed by the Company to me, but also information developed or learned by me during the course of my employment with or service to the Company.

(c) Protection of Confidential Information. I will not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any third party, other than in my assigned duties and for the benefit of the Company, any of the Company's Confidential Information, either during or after my employment with or service to the Company. In the event I desire to publish the results of my work for the Company through literature or speeches, I will submit such literature or speeches to the President of the Company at least fifteen (15) days before dissemination of such information for a determination of whether such disclosure may alter trade secret status, may be highly prejudicial to the interests of the Company, or may constitute an invasion of its privacy. I agree not to publish, disclose or otherwise disseminate such information without prior written approval of the President of the Company. I acknowledge that I am aware that the unauthorized disclosure of Confidential Information of the Company may be highly prejudicial to its interests, an invasion of privacy, and an improper disclosure of trade secrets.

(d) Delivery of Confidential Information. Upon request or when my employment with or service to the Company terminates, I will immediately deliver to the Company all copies of any and all materials and writings received from, created for, or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(e) Location and Reproduction. I shall maintain at my work station and/or any other place under my control only such Confidential Information as I have a current "need to know." I shall return to the appropriate person or location or otherwise properly dispose of Confidential Information once that need to know no longer exists. I shall not make copies of or otherwise reproduce Confidential Information unless there is a legitimate business need of the Company for reproduction.

(f) Prior Actions and Knowledge. I represent and warrant that from the time of my first contact with the Company I held in strict confidence all Confidential Information and have not disclosed any Confidential Information, directly or indirectly, to anyone outside the Company, or used, copied, published, or summarized any Confidential information, except to the extent otherwise permitted in this Agreement.

(g) Third-Party Information. I acknowledge that the Company has received and in the future will receive from third parties their confidential information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that, during the Engagement and thereafter, I will hold all such confidential information in the strictest confidence and will not disclose or use it, except as necessary to perform my obligations hereunder and as is consistent with the Company's agreement with such third parties.

(h) Third Parties. I represent that my employment with or service to the Company does not and will not breach any agreements with or duties to a former employer or any other third party. I will not disclose to the Company or use on its behalf any confidential information belonging to others and I will not bring onto the premises of the Company any confidential information belonging to any such party unless consented to in writing by such party.

(i) Defense of Trade Secrets Act ("DTSA") Notice: In accordance with the Company policy on the protection of Company Confidential Information contained in the Employee Handbook, I understand that if, after first taking reasonable and appropriate steps to protect the confidentiality of a Company trade secret, I disclose a trade secret to a U.S. government official or attorney solely for the purpose of reporting or investigating a suspected violation of law (a "Legally Permitted Disclosure"): (1.) I will be granted immunity

from being held civilly or criminally liable under any federal or state trade secret law for this Legally Permitted Disclosure; (2.) I have the right to further disclose this Legally Permitted Disclosure to my attorney and to use said trade secret information in a related court proceeding; and (3.) I will not be subject to retaliation by the Company for engaging in these actions.

3.   Proprietary Rights, Inventions and New Ideas.

(a)  Definition.   The term "Subject Ideas or Inventions" includes any and all ideas, processes, trademarks, service marks, inventions, designs, technologies, computer hardware or software, original works of authorship, formulas, discoveries, patents, copyrights, copyrightable works products, marketing and business ideas, and all improvements, know-how, data, rights, and claims related to the foregoing that, whether or not patentable, are conceived, developed or created and which: (1) relate to the Company's current or contemplated business or activities; (2) relate to the Company's actual or demonstrably anticipated research or development; (3) result from any work performed by me for the Company (whether before or after the date of this Agreement); (4) involve the use of the Company's equipment, supplies, facilities or trade secrets; (5) result from or are suggested by any work done by the Company or at the Company's request, or any projects specifically assigned to me; or (6) result from my access to any of the Company's memoranda, notes, records, drawings, sketches, models, maps, customer lists, research results, data, formulae, specifications, inventions, processes, equipment or other materials (collectively, "Company Materials").

(b)  Company Ownership.   All right, title and interest in and to all Subject Ideas and Inventions, including but not limited to all registrable and patent rights which may subsist therein, shall be held and owned solely by the Company, and where applicable, all Subject Ideas and Inventions shall be considered works made for hire.   I shall mark all Subject Ideas and Inventions with the Company's copyright or other proprietary notice as directed by the Company and shall take all actions deemed necessary by the Company to protect the Company's rights therein.   In the event that the Subject Ideas and Inventions shall be deemed not to constitute works made for hire, or in the event that I should otherwise, by operation of law, be deemed to retain any rights (whether moral rights or otherwise) to any Subject Ideas and Inventions, I agree to assign to the Company, and I hereby irrevocably assign to the Company, without further consideration, my entire right, title and interest in, to and under each and every such Subject Idea and Invention, including, without limitation, all worldwide copyrights, patent rights, trademark and trade dress rights and other proprietary rights therein and all applications or registrations (including continuations thereof) relating thereto.   Without limiting the foregoing, I also hereby waive and relinquish any claims of "moral rights" or "droit moral" relating to the Subject Ideas or Inventions.

(c)  California Labor Code (If Applicable).   However, Section 3(b) shall not apply if and to the extent that California Labor Code Section 2870 lawfully prohibits the assignment of rights in such intellectual property.   I acknowledge that I understand the limits placed on this definition by California Labor Code Section 2870, if applicable to me, which provides:

(1) "Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

a.   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

b.   Result from any work performed by the employee for the employer.

(2) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

(d) Burden.  I understand that I bear the full burden of proving to the Company that an Invention qualifies fully under Section 2870.  I agree to disclose promptly to the Company full details of any and all Subject Ideas and Inventions.

(e) Maintenance of Records.  I agree to keep and maintain adequate and current written records of all Subject Ideas and Inventions and their development made by me (solely or jointly with others) during the term of my employment with or service to the Company.  These records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  These records will be available to and remain the sole property of the Company at all times.

(f) Determination of Subject Ideas or Inventions.  I further agree that all information and records pertaining to any idea, process, trademark, service mark, invention, technology, computer hardware or software, original work of authorship, design, formula, discovery, patent, copyright, product, and all improvements, know-how, rights, and claims related to the foregoing ("Intellectual Property"), that I do not believe to be a Subject Idea or Invention, but that is conceived, developed, or reduced to practice by the Company (alone by me or with others) during the Engagement and for one (1) year thereafter, shall be disclosed promptly by me to the Company (such disclosure to be received in confidence).  The Company shall examine such information to determine if in fact the Intellectual Property is a Subject Idea or Invention subject to this Agreement.

(g) Access.  Because of the difficulty of establishing when any Subject Ideas or Inventions are first conceived by me, or whether it results from my access to Confidential Information or Company Materials, I agree that any Subject Idea and Invention shall, among other circumstances, be deemed to have resulted from my access to Company Materials if:  (1) it grew out of or resulted from my work with the Company or is related to the business of the Company, and (2) it is made, used, sold, exploited or reduced to practice, or an application for patent, trademark, copyright or other proprietary protection is filed thereon, by me or with my significant aid, within one year after termination of the Engagement.

(h) Assistance.  I further agree to assist the Company in every proper way (but at the Company's expense) to obtain and from time to time enforce patents, copyrights or other rights or registrations on said Subject Ideas and Inventions in any and all countries, and to that end will execute all documents necessary:

(1) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(2) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection; and

(3) to cooperate with the Company (but at the Company's expense) in any enforcement or infringement proceeding on such letters patent, copyright or other analogous protection.

(i) Authorization to Company.  In the event the Company is unable, after reasonable effort, to secure my signature on any patent, copyright or other analogous protection relating to a Subject Idea and Invention, whether because of my physical or mental incapacity or for any other reason whatsoever, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf and stead to execute and file any such application, applications

or other documents and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of letters patent, copyright or other analogous rights or protections thereon with the same legal force and effect as if executed by me.  My obligation to assist the Company in obtaining and enforcing patents and copyrights for Subject Ideas and Inventions in any and all countries shall continue beyond the termination of my relationship with the Company, but the Company shall compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance.

      (j) <u>Exhibit</u>.  I acknowledge that there are no currently existing ideas, processes, inventions, discoveries, marketing or business ideas or improvements which I desire to exclude from the operation of this Agreement, unless a reference thereto has been included on <u>Exhibit A</u> attached hereto.  To the best of my knowledge, there is no other contract to assign inventions, trademarks, copyrights, ideas, processes, discoveries or other intellectual property that is now in existence between me and any other person (including any business or governmental entity).

      (k) <u>No Use of Name</u>.  I shall not at any time use the Company's name or any the Company trademark(s) or trade name(s) in any advertising or publicity without the prior written consent of the Company.

    4.  <u>Representations and Warranties</u>.  I represent and warrant (i) that I have no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with my undertaking a relationship with the Company; (ii) that the performance of the services called for by this Agreement do not and will not violate any applicable law, rule or regulation or any proprietary or other right of any third party; (iii) that I will not use in the performance of my responsibilities for the Company any materials or documents of a former employer; (iv) that I have not entered into or will enter into any agreement (whether oral or written) in conflict with this Agreement; (v) that the performance of the services, assignments or obligations hereunder and the Subject Ideas or Inventions do not and will not violate or infringe upon the rights of any third party, including without limitation, any patent, copyright, trade secret, trademark, contractual, employment, proprietary or confidential information or nondisclosure, or other proprietary right; and (vi) that I will comply with all Company policies and procedures during my Engagement, including but not limited to those set forth in the Company Employee Handbook, as they may be modified from time to time.

    5.  <u>Non-Competition</u>.  During my Engagement and for one (1) year thereafter, to the extent permitted by the laws of the Commonwealth of Pennsylvania or other applicable laws, I will not, directly or indirectly, with or without compensation, own, manage, operate, join, control, advise, direct, or participate, as a shareholder (other than as a shareholder with less than 1% of the outstanding common stock of a public company), director, officer, manager, principal partner, employee, consultant, independent contractor, technical or business advisor or otherwise (or any foreign equivalents of the foregoing), in any business venture, or  engage in conduct in preparation for same, with any person or entity that is in the same or similar business as the Company (or any division of the Company), which is involved in the generation or purchase of leads for resale or remarketing purposes (a "Competing or Conflicting Business").  I also agree to immediately disclose to the Company any involvement I may have now or at any time during the Non-Competition Period in a Competing or Conflicting Business, or in any business venture that could be construed by a reasonable person as potentially being a Competing or Conflicting Business, so that the Company can investigate the matter, determine if a violation of this Paragraph has occurred, and address the matter with me immediately to avoid damage (or further damage) to the Company's interests.  I recognize that the time restrictions contained in this paragraph protect the Company's legitimate business interests in its Confidential Information, and help ensure that my employment or other association with a Competing or Conflicting Business will not place the Company at an unfair competitive disadvantage.

    6.  <u>Non-Solicitation</u>.  Because the Company's business involves the generation and/or purchase of leads for resale or remarketing purposes, the Company often acts as a broker between businesses that purchase information ("Lead Buyers") about customers interested in particular types of products or services ("Leads")

and other businesses that have internet properties or other marketing capacities capable of generating or assisting with the generation of Leads ("Lead Providers" and "Publishers"). Consequently, the Company maintains Proprietary Information in the form of lists of pricing, technical details, performance statistics, and other competitively sensitive information related to Lead Buyers, Lead Providers, and Publishers. I acknowledge and agree that information pertaining to Lead Buyers, Lead Providers, and Publishers is competitively sensitive Proprietary Information, regardless of whether the Company sends or receives payment from such parties. Accordingly, to protect what I acknowledge are the Company's legitimate business interests in its Confidential Information, which includes this competitively sensitive Proprietary Information, and to avoid placing the Company at an unfair competitive disadvantage, during my Engagement and for one (1) year thereafter:

(a) Employees and Other Service Providers. I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any other person or entity for the purpose or effect of: (i) interfering with the Company's relationship with its employees and other service providers, or (ii) soliciting, recruiting, causing, or attempting to persuade any person to terminate or reduce such person's employment or service with us, whether or not such person is a full-time employee or service provider and whether or not such employment or service is pursuant to a written agreement or is at-will;

(b) Lead Buyers and Other Customers. I will not, directly or indirectly, on my own behalf or on behalf of others, solicit, contact or attempt to persuade any current or prospective Lead Buyer or other customer of the Company (collectively "Customers") to alter such Customer's or prospective Customer's relationship with us or to engage any Competing or Conflicting Business to perform services that the Company can perform in the ordinary course of business. I understand that "prospective Customer" means any prospective Customer of the Company who I had knowledge of or contact with at any time during the twelve (12) months preceding the termination of my Engagement;

(c) Lead Providers and Publishers. I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any person or entity who has been a Lead Provider or Publisher of Company with the purpose or effect of: (i) purchasing online media, advertising space, internet traffic, or Leads from such Lead Provider or Publisher; (ii) promoting through any on-line means advertisements, products or services through such Lead Provider or Publisher; (iii) compensating such Lead Provider or Publisher for online advertising services; or (iv) interfering with the Company's relationship with such Lead Provider or Publisher or inducing or causing such person or entity to terminate or reduce his/her/its relationship with the Company; and

(d) Suppliers. I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any person or entity who has supplied products or services to Company or its Affiliates ("Supplier") during such period with the intent or effect of: (i) interfering with Company's or its Affiliates' relationship with such Supplier; or (ii) inducing or causing such Supplier to terminate or reduce his/her/its relationship with the Company.

7. Termination Obligations.

(a) Upon the termination of my relationship with the Company or promptly upon the Company's request, I shall surrender to the Company all equipment, tangible Proprietary Information, documents, books, notebooks, records, reports, notes, memoranda, drawings, sketches, models, maps, contracts, lists, computer disks (and other computer-generated files and data), any other data and records of any kind, and copies thereof (collectively, "Company Records"), created on any medium and furnished to, obtained by, or prepared by myself in the course of or incident to my employment or service, that are in my possession or under my control.

(b) My representations, warranties, and obligations contained in this Agreement shall survive the termination of the Engagement.

(c) Following any termination of the Engagement, I will fully cooperate with the Company in all matters relating to my continuing obligations under this Agreement.

(d) In the event that I leave the employ of or service to the Company I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

(e) Upon termination of the Engagement, I will re-review this Agreement, and I will sign and remit to the Company a Certificate of Compliance acknowledging compliance with this Agreement, no later than five (5) days after the effective date of my termination of employment or service.

8.  <u>Injunctive Relief</u>.  I acknowledge that my failure to carry out any obligation under this Agreement, or a breach by me of any provision herein, will constitute immediate and irreparable damage to the Company, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order for specific performance, and other equitable relief.  I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.  I also understand that other action may be taken and remedies enforced against me.

9.  <u>Modification</u>.  No modification of this Agreement shall be valid unless made in writing and signed by both parties.

10. <u>Binding Effect</u>.  This Agreement shall be binding upon me, my heirs, executors, assigns and administrators and is for the benefit of the Company and its successors and assigns.

11. <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and all actions arising under or in connection therewith shall be governed by, the internal laws of the Commonwealth of Pennsylvania (without reference to conflict of law principles). Each party hereby consents to the personal jurisdiction of the Federal or Pennsylvania courts located in Philadelphia County, Pennsylvania, and agrees that all disputes arising from or relating to this Agreement may be adjudicated in such courts. Each party hereby further expressly and irrevocably waives any objection to the personal jurisdiction or venue of such courts and consents to service of process by notice sent by regular mail to that party's last known residence (as noted in the Company's records) and/or by any means authorized by Pennsylvania law.

12. <u>Integration</u>.  This Agreement sets forth the parties' mutual rights and obligations with respect to proprietary information, prohibited competition, and intellectual property.  It is intended to be the final, complete, and exclusive statement of the terms of the parties' agreements regarding these subjects.  This Agreement supersedes all other prior and contemporaneous agreements and statements on these subjects, and it may not be contradicted by evidence of any prior or contemporaneous statements or agreements.  To the extent that the practices, policies, or procedures of the Company, now or in the future, apply to myself and are inconsistent with the terms of this Agreement, the provisions of this Agreement shall control unless changed in writing by the Company.

13. <u>Service at Will</u>.  This Agreement is not an employment agreement.  I understand that I or the Company may terminate my association, service or employment with it at any time, with or without cause, subject to the terms of any separate written agreement executed by a duly authorized representative of the Company.

14. <u>Construction</u>.  This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party.  By way of example and not limitation, this Agreement shall not be

construed against the party responsible for any language in this Agreement.  The headings of the paragraphs hereof are inserted for convenience only, and do not constitute part of and shall not be used to interpret this Agreement.

15.  <u>Attorneys' Fees</u>.  Should either I or the Company, or any heir, personal representative, successor or permitted assign of either party, resort to legal proceedings to enforce this Agreement, the prevailing party in such legal proceeding shall be awarded, in addition to such other relief as may be granted, attorneys' fees and costs incurred in connection with such proceeding, provided that if a party prevails only in part the court shall award fees and costs in accordance with the relative success of each party.

16.  <u>Severability</u>.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

17.  <u>Rights Cumulative</u>.  The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by either the Company or me (or by that party's successor), whether pursuant hereto, to any other agreement, or to law, shall not preclude or waive that party's right to exercise any or all other rights and remedies.  This Agreement will inure to the benefit of the Company and its successors and assigns.

18.  <u>Nonwaiver</u>.  The failure of either the Company or me, whether purposeful or otherwise, to exercise in any instance any right, power or privilege under this Agreement or under law shall not constitute a waiver of any other right, power or privilege, nor of the same right, power or privilege in any other instance.  Any waiver by the Company or by me must be in writing and signed by either myself, if I am seeking to waive any of my rights under this Agreement, or by an officer of the Company (other than me) or some other person duly authorized by the Company.

19.  <u>Notices</u>.  Any notice, request, consent or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if it is in writing, and shall be deemed given if and when it is hand delivered or sent by regular mail, with postage prepaid, to my residence (as noted in the Company's records), or to the Company's principal office, as the case may be, or when sent if sent by electronic mail or facsimile during normal business hours of the recipient and if not sent during normal business hours then on the recipient's next business day.  Any third party employing me, or otherwise utilizing my services or evidencing an intention to do so, during my Engagement or any period of restriction thereafter provided in this Agreement may be notified of the existence and provisions of this Agreement.

20.  <u>Date of Effectiveness</u>.  This Agreement shall be deemed effective as of the commencement of my employment with or service to the Company.

21.  <u>Agreement to Perform Necessary Acts</u>.  I agree to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

22.  <u>Assignment</u>.  This Agreement may not be assigned by me without the Company's prior written consent.

23.  <u>Compliance with Law</u>.  I agree to abide by all federal, state, and local laws, ordinances and regulations.

24.  <u>Acknowledgment</u>.  I acknowledge that I have had the opportunity to consult legal counsel in regard to this Agreement, that I have read and understand this Agreement, that I am fully aware of its legal effect,

and that I have entered into it freely and voluntarily and based on my own judgment and not on any representations or promises other than those contained in this Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth below.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S OR CONSULTANT'S RIGHTS TO INVENTIONS AND OTHER INTELLECTUAL PROPERTY THE EMPLOYEE OR CONSULTANT MAY DEVELOP DURING HIS OR HER EMPLOYMENT OR SERVICE.

Dated: __May____30_, 2017

*Colin Sholes*
Name:
          Colin Sholes

Agreed and accepted:

TORCHLIGHT TECHNOLOGY GROUP LLC

By: _____
Name:   **Helene Seydoux**
Title:    **Managing Director**

## **EXHIBIT A**

A.      Inventions made by me prior to my employment or service with the Company that I desire to be excepted from the Agreement to which this Exhibit A is attached (if none, write "NONE"):

Reporting and tracking software used by Cure Consulting / AdSolve which interfaces with Torchlight's systems (including by not limited to – health_track, rover, grok, ladman)

All holdings, assets, and IP of SSRP Ventures and any advertising and marketing done on their behalf

All holdings, assets, and IP of Cure Consulting and any advertising and marketing done on their behalf

All holdings, assets, and IP of Identity Protect and any advertising and marketing done on their behalf

B.      Prior agreements to which I am a party that may interfere with full compliance with the Agreement to which this Exhibit A is attached (if none, write "NONE"):

Cure Consulting operating agreement & all present and future contracts associated with the company

SSRP Ventures operating agreement & all present and future contracts associated with the company

Identity Protect operating agreement & all present and future contracts associated with the company

Acus Strategies operating agreement & all present and future contracts associated with the company, subject to the terms of any agreements between Torchlight and Acus

Dated:  May     30, 2017                    *Colin Sholes*
                                        Name:   Colin Sholes

# **EXHIBIT C**

## PROPRIETARY INFORMATION, COMPETITION, AND INVENTIONS ASSIGNMENT AGREEMENT

This revised PROPRIETARY INFORMATION, COMPETITION, AND INVENTIONS ASSIGNMENT AGREEMENT (the "Agreement") is made between Torchlight Technology Group, LLC (the "Company") and the undersigned employee or consultant.

In consideration of my participation in the Company's equity compensation program, the receipt of confidential information while associated with the Company, and other good and valuable consideration, intending to be legally bound, I, the undersigned individual, agree that:

1. <u>Term of Agreement</u>.  This Agreement shall continue in full force and effect for the duration of my employment with or service to the Company (whether before or after the date of this Agreement, the "Engagement") and shall continue thereafter as otherwise provided in this Agreement.

2. <u>Confidentiality</u>.

(a) <u>Definitions</u>.  "Proprietary Information" is all information and any idea in whatever form, tangible or intangible, pertaining in any manner to the business of the Company or any of its Affiliates (defined as any subsidiaries or affiliates of the Company that directly or indirectly control, are controlled by, or are under common control with the Company), or its employees, clients, consultants, or business associates, which was produced by any employee or consultant of the Company in the course of his or her employment or consulting relationship or otherwise produced or acquired by or on behalf of the Company. All Proprietary Information not generally known outside of the Company's organization, all Proprietary Information so known only through improper means and any information received by the Company from third parties that is subject to confidentiality obligations, is competitively sensitive and shall be deemed "Confidential Information."  By example and without limiting the foregoing definition, Proprietary and Confidential Information shall include, but not be limited to:

(1) formulas, research and development techniques, processes, trade secrets, including but not limited to Torchlight Technology Group's proprietary programs, computer programs, software, electronic codes, mask works, inventions, innovations, patents, patent applications, discoveries, improvements, data, know-how, formats, test results, and research projects;

(2) information about costs, profits, markets, sales, contracts and lists of customers, and distributors;

(3) business, marketing, and strategic plans;

(4) forecasts, unpublished financial information, budgets, projections, and customer identities, characteristics and agreements; and

(5) employee personnel files and compensation information.

Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company. Confidential Information shall be covered by this Agreement whether it is received by the undersigned employee or consultant before or after the date of this Agreement.

(b) <u>Existence of Confidential Information</u>.  The Company owns and has developed and compiled, and will develop and compile, certain trade secrets, proprietary techniques and other Confidential Information which have great value to its business.  This Confidential Information includes not only information disclosed by the Company to me, but also information developed or learned by me during the course of my employment with or service to the Company.

(c) <u>Protection of Confidential Information</u>.  I will not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any third party, other than in my assigned duties and for the benefit of the Company, any of the Company's Confidential Information, either during or after my employment with or service to the Company.  In the event I desire to publish the results of my work for the Company through literature or speeches, I will submit such literature or speeches to the President of the Company at least fifteen (15) days before dissemination of such information for a determination of whether such disclosure may alter trade secret status, may be highly prejudicial to the interests of the Company, or may constitute an invasion of its privacy.  I agree not to publish, disclose or otherwise disseminate such information without prior written approval of the President of the Company.  I acknowledge that I am aware that the unauthorized disclosure of Confidential Information of the Company may be highly prejudicial to its interests, an invasion of privacy, and an improper disclosure of trade secrets.

(d) <u>Delivery of Confidential Information</u>.  Upon request or when my employment with or service to the Company terminates, I will immediately deliver to the Company all copies of any and all materials and writings received from, created for, or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(e) <u>Location and Reproduction</u>.  I shall maintain at my work station and/or any other place under my control only such Confidential Information as I have a current "need to know."  I shall return to the appropriate person or location or otherwise properly dispose of Confidential Information once that need to know no longer exists.  I shall not make copies of or otherwise reproduce Confidential Information unless there is a legitimate business need of the Company for reproduction.

(f) <u>Prior Actions and Knowledge</u>.  I represent and warrant that from the time of my first contact with the Company I held in strict confidence all Confidential Information and have not disclosed any Confidential Information, directly or indirectly, to anyone outside the Company, or used, copied, published, or summarized any Confidential information, except to the extent otherwise permitted in this Agreement.

(g) <u>Third-Party Information</u>.  I acknowledge that the Company has received and in the future will receive from third parties their confidential information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree that, during the Engagement and thereafter, I will hold all such confidential information in the strictest confidence and will not disclose or use it, except as necessary to perform my obligations hereunder and as is consistent with the Company's agreement with such third parties.

(h) <u>Third Parties</u>.  I represent that my employment with or service to the Company does not and will not breach any agreements with or duties to a former employer or any other third party.  I will not disclose to the Company or use on its behalf any confidential information belonging to others and I will not bring onto the premises of the Company any confidential information belonging to any such party unless consented to in writing by such party.

(i) <u>Defense of Trade Secrets Act ("DTSA") Notice</u>: In accordance with the Company policy on the protection of Company Confidential Information contained in the Employee Handbook, I understand that if, after first taking reasonable and appropriate steps to protect the confidentiality of a Company trade secret, I disclose a trade secret to a U.S. government official or attorney solely for the purpose of reporting or investigating a suspected violation of law (a "Legally Permitted Disclosure"): (1.) I will be granted immunity

from being held civilly or criminally liable under any federal or state trade secret law for this Legally Permitted Disclosure; (2.) I have the right to further disclose this Legally Permitted Disclosure to my attorney and to use said trade secret information in a related court proceeding; and (3.) I will not be subject to retaliation by the Company for engaging in these actions.

3.   Proprietary Rights, Inventions and New Ideas.

(a)   Definition.   The term "Subject Ideas or Inventions" includes any and all ideas, processes, trademarks, service marks, inventions, designs, technologies, computer hardware or software, original works of authorship, formulas, discoveries, patents, copyrights, copyrightable works products, marketing and business ideas, and all improvements, know-how, data, rights, and claims related to the foregoing that, whether or not patentable, are conceived, developed or created and which: (1) relate to the Company's current or contemplated business or activities; (2) relate to the Company's actual or demonstrably anticipated research or development; (3) result from any work performed by me for the Company (whether before or after the date of this Agreement); (4) involve the use of the Company's equipment, supplies, facilities or trade secrets; (5) result from or are suggested by any work done by the Company or at the Company's request, or any projects specifically assigned to me; or (6) result from my access to any of the Company's memoranda, notes, records, drawings, sketches, models, maps, customer lists, research results, data, formulae, specifications, inventions, processes, equipment or other materials (collectively, "Company Materials").

(b)   Company Ownership.   All right, title and interest in and to all Subject Ideas and Inventions, including but not limited to all registrable and patent rights which may subsist therein, shall be held and owned solely by the Company, and where applicable, all Subject Ideas and Inventions shall be considered works made for hire.   I shall mark all Subject Ideas and Inventions with the Company's copyright or other proprietary notice as directed by the Company and shall take all actions deemed necessary by the Company to protect the Company's rights therein.   In the event that the Subject Ideas and Inventions shall be deemed not to constitute works made for hire, or in the event that I should otherwise, by operation of law, be deemed to retain any rights (whether moral rights or otherwise) to any Subject Ideas and Inventions, I agree to assign to the Company, and I hereby irrevocably assign to the Company, without further consideration, my entire right, title and interest in, to and under each and every such Subject Idea and Invention, including, without limitation, all worldwide copyrights, patent rights, trademark and trade dress rights and other proprietary rights therein and all applications or registrations (including continuations thereof) relating thereto.   Without limiting the foregoing, I also hereby waive and relinquish any claims of "moral rights" or "droit moral" relating to the Subject Ideas or Inventions.

(c)   California Labor Code (If Applicable).   However, Section 3(b) shall not apply if and to the extent that California Labor Code Section 2870 lawfully prohibits the assignment of rights in such intellectual property.   I acknowledge that I understand the limits placed on this definition by California Labor Code Section 2870, if applicable to me, which provides:

(1)   "Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

a.   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

b.   Result from any work performed by the employee for the employer.

(2) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

(d) <u>Burden</u>.  I understand that I bear the full burden of proving to the Company that an Invention qualifies fully under Section 2870.  I agree to disclose promptly to the Company full details of any and all Subject Ideas and Inventions.

(e) <u>Maintenance of Records</u>.  I agree to keep and maintain adequate and current written records of all Subject Ideas and Inventions and their development made by me (solely or jointly with others) during the term of my employment with or service to the Company.  These records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  These records will be available to and remain the sole property of the Company at all times.

(f) <u>Determination of Subject Ideas or Inventions</u>.  I further agree that all information and records pertaining to any idea, process, trademark, service mark, invention, technology, computer hardware or software, original work of authorship, design, formula, discovery, patent, copyright, product, and all improvements, know-how, rights, and claims related to the foregoing ("Intellectual Property"), that I do not believe to be a Subject Idea or Invention, but that is conceived, developed, or reduced to practice by the Company (alone by me or with others) during the Engagement and for one (1) year thereafter, shall be disclosed promptly by me to the Company (such disclosure to be received in confidence).  The Company shall examine such information to determine if in fact the Intellectual Property is a Subject Idea or Invention subject to this Agreement.

(g) <u>Access</u>.  Because of the difficulty of establishing when any Subject Ideas or Inventions are first conceived by me, or whether it results from my access to Confidential Information or Company Materials, I agree that any Subject Idea and Invention shall, among other circumstances, be deemed to have resulted from my access to Company Materials if:  (1) it grew out of or resulted from my work with the Company or is related to the business of the Company, and (2) it is made, used, sold, exploited or reduced to practice, or an application for patent, trademark, copyright or other proprietary protection is filed thereon, by me or with my significant aid, within one year after termination of the Engagement.

(h) <u>Assistance</u>.  I further agree to assist the Company in every proper way (but at the Company's expense) to obtain and from time to time enforce patents, copyrights or other rights or registrations on said Subject Ideas and Inventions in any and all countries, and to that end will execute all documents necessary:

(1) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(2) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection; and

(3) to cooperate with the Company (but at the Company's expense) in any enforcement or infringement proceeding on such letters patent, copyright or other analogous protection.

(i) <u>Authorization to Company</u>.  In the event the Company is unable, after reasonable effort, to secure my signature on any patent, copyright or other analogous protection relating to a Subject Idea and Invention, whether because of my physical or mental incapacity or for any other reason whatsoever, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf and stead to execute and file any such application, applications

or other documents and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of letters patent, copyright or other analogous rights or protections thereon with the same legal force and effect as if executed by me.  My obligation to assist the Company in obtaining and enforcing patents and copyrights for Subject Ideas and Inventions in any and all countries shall continue beyond the termination of my relationship with the Company, but the Company shall compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance.

(j)  <u>Exhibit</u>.   I acknowledge that there are no currently existing ideas, processes, inventions, discoveries, marketing or business ideas or improvements which I desire to exclude from the operation of this Agreement, unless a reference thereto has been included on <u>Exhibit A</u> attached hereto.  To the best of my knowledge, there is no other contract to assign inventions, trademarks, copyrights, ideas, processes, discoveries or other intellectual property that is now in existence between me and any other person (including any business or governmental entity).

(k)  <u>No Use of Name</u>.   I shall not at any time use the Company's name or any the Company trademark(s) or trade name(s) in any advertising or publicity without the prior written consent of the Company.

4.  <u>Representations and Warranties</u>.   I represent and warrant (i) that I have no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with my undertaking a relationship with the Company; (ii) that the performance of the services called for by this Agreement do not and will not violate any applicable law, rule or regulation or any proprietary or other right of any third party; (iii) that I will not use in the performance of my responsibilities for the Company any materials or documents of a former employer; (iv) that I have not entered into or will enter into any agreement (whether oral or written) in conflict with this Agreement; (v) that the performance of the services, assignments or obligations hereunder and the Subject Ideas or Inventions do not and will not violate or infringe upon the rights of any third party, including without limitation, any patent, copyright, trade secret, trademark, contractual, employment, proprietary or confidential information or nondisclosure, or other proprietary right; and (vi) that I will comply with all Company policies and procedures during my Engagement, including but not limited to those set forth in the Company Employee Handbook, as they may be modified from time to time.

5.  <u>Non-Competition</u>.   During my Engagement and for one (1) year thereafter, to the extent permitted by the laws of the Commonwealth of Pennsylvania or other applicable laws, I will not, directly or indirectly, with or without compensation, own, manage, operate, join, control, advise, direct, or participate, as a shareholder (other than as a shareholder with less than 1% of the outstanding common stock of a public company), director, officer, manager, principal partner, employee, consultant, independent contractor, technical or business advisor or otherwise (or any foreign equivalents of the foregoing), in any business venture, or  engage in conduct in preparation for same, with any person or entity that is in the same or similar business as the Company (or any division of the Company), which is involved in the generation or purchase of leads for resale or remarketing purposes (a "Competing or Conflicting Business").  I also agree to immediately disclose to the Company any involvement I may have now or at any time during the Non-Competition Period in a Competing or Conflicting Business, or in any business venture that could be construed by a reasonable person as potentially being a Competing or Conflicting Business, so that the Company can investigate the matter, determine if a violation of this Paragraph has occurred, and address the matter with me immediately to avoid damage (or further damage) to the Company's interests.  I recognize that the time restrictions contained in this paragraph protect the Company's legitimate business interests in its Confidential Information, and help ensure that my employment or other association with a Competing Business will not place the Company at an unfair competitive disadvantage.

6.  <u>Non-Solicitation</u>.  Because the Company's business involves the generation and/or purchase of leads for resale or remarketing purposes, the Company often acts as a broker between businesses that purchase information ("Lead Buyers") about customers interested in particular types of products or services ("Leads")

and other businesses that have internet properties or other marketing capacities capable of generating or assisting with the generation of Leads ("Lead Providers" and "Publishers").  Consequently, the Company maintains Proprietary Information in the form of lists of pricing, technical details, performance statistics, and other competitively sensitive information related to Lead Buyers, Lead Providers, and Publishers. I acknowledge and agree that information pertaining to Lead Buyers, Lead Providers, and Publishers is competitively sensitive Proprietary Information, regardless of whether the Company sends or receives payment from such parties.  Accordingly, to protect what I acknowledge are the Company's legitimate business interests in its Confidential Information, which includes this competitively sensitive Proprietary Information, and to avoid placing the Company at an unfair competitive disadvantage, during my Engagement and for one (1) year thereafter:

(a)  Employees and Other Service Providers**.**  I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any other person or entity for the purpose or effect of: (i) interfering with the Company's relationship with its employees and other service providers, or (ii) soliciting, recruiting, causing, or attempting to persuade any person to terminate or reduce such person's employment or service with us, whether or not such person is a full-time employee or service provider and whether or not such employment or service is pursuant to a written agreement or is at-will;

(b)  Lead Buyers and Other Customers**.** I will not, directly or indirectly, on my own behalf or on behalf of others, solicit, contact or attempt to persuade any current or prospective Lead Buyer or other customer of the Company (collectively "Customers") to alter such Customer's or prospective Customer's relationship with us or to engage any Competing Business to perform services that we can perform in the ordinary course of business.  I understand that "prospective Customer" means any prospective Customer of the Company who I had knowledge of or contact with at any time during the twelve (12) months preceding the termination of my Engagement;

(c)  Lead Providers and Publishers**.** I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any person or entity who has been a Lead Provider or Publisher of Company with the purpose or effect of: (i) purchasing online media, advertising space, internet traffic, or Leads from such Lead Provider or Publisher; (ii) promoting through any on-line means advertisements, products or services through such Lead Provider or Publisher; (iii) compensating such Lead Provider or Publisher for online advertising services; or (iv) interfering with the Company's relationship with such Lead Provider or Publisher or inducing or causing such person or entity to terminate or reduce his/her/its relationship with the Company; and

(d)  Suppliers. I will not, directly or indirectly, on my own behalf or on behalf of others, contact or communicate with any person or entity who has supplied products or services to Company or its Affiliates ("Supplier") during such period with the intent or effect of: (i) interfering with Company's or its Affiliates' relationship with such Supplier; or (ii) inducing or causing such Supplier to terminate or reduce his/her/its relationship with the Company.

7.  Termination Obligations.

(a)  Upon the termination of my relationship with the Company or promptly upon the Company's request, I shall surrender to the Company all equipment, tangible Proprietary Information, documents, books, notebooks, records, reports, notes, memoranda, drawings, sketches, models, maps, contracts, lists, computer disks (and other computer-generated files and data), any other data and records of any kind, and copies thereof (collectively, "Company Records"), created on any medium and furnished to, obtained by, or prepared by myself in the course of or incident to my employment or service, that are in my possession or under my control.

(b) My representations, warranties, and obligations contained in this Agreement shall survive the termination of the Engagement.

(c) Following any termination of the Engagement, I will fully cooperate with the Company in all matters relating to my continuing obligations under this Agreement.

(d) In the event that I leave the employ of or service to the Company I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

(e) Upon termination of the Engagement, I will re-review this Agreement, and I will sign and remit to the Company a Certificate of Compliance acknowledging compliance with this Agreement, no later than five (5) days after the effective date of my termination of employment or service.

8.   <u>Injunctive Relief</u>.  I acknowledge that my failure to carry out any obligation under this Agreement, or a breach by me of any provision herein, will constitute immediate and irreparable damage to the Company, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order for specific performance, and other equitable relief.  I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.  I also understand that other action may be taken and remedies enforced against me.

9.   <u>Modification</u>.  No modification of this Agreement shall be valid unless made in writing and signed by both parties.

10.   <u>Binding Effect</u>.   This Agreement shall be binding upon me, my heirs, executors, assigns and administrators and is for the benefit of the Company and its successors and assigns.

11.   <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and all actions arising under or in connection therewith shall be governed by, the internal laws of the Commonwealth of Pennsylvania (without reference to conflict of law principles). Each party hereby consents to the personal jurisdiction of the Federal or Pennsylvania courts located in Philadelphia County, Pennsylvania, and agrees that all disputes arising from or relating to this Agreement may be adjudicated in such courts. Each party hereby further expressly and irrevocably waives any objection to the personal jurisdiction or venue of such courts and consents to service of process by notice sent by regular mail to that party's last known residence (as noted in the Company's records) and/or by any means authorized by Pennsylvania law.

12.   <u>Integration</u>.   This Agreement sets forth the parties' mutual rights and obligations with respect to proprietary information, prohibited competition, and intellectual property.  It is intended to be the final, complete, and exclusive statement of the terms of the parties' agreements regarding these subjects.  This Agreement supersedes all other prior and contemporaneous agreements and statements on these subjects, and it may not be contradicted by evidence of any prior or contemporaneous statements or agreements.  To the extent that the practices, policies, or procedures of the Company, now or in the future, apply to myself and are inconsistent with the terms of this Agreement, the provisions of this Agreement shall control unless changed in writing by the Company.

13.   <u>Service at Will</u>.  This Agreement is not an employment agreement.  I understand that I or the Company may terminate my association, service or employment with it at any time, with or without cause, subject to the terms of any separate written agreement executed by a duly authorized representative of the Company.

14.   <u>Construction</u>.  This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party.  By way of example and not limitation, this Agreement shall not be

construed against the party responsible for any language in this Agreement.  The headings of the paragraphs hereof are inserted for convenience only, and do not constitute part of and shall not be used to interpret this Agreement.

15. <u>Attorneys' Fees</u>.  Should either I or the Company, or any heir, personal representative, successor or permitted assign of either party, resort to legal proceedings to enforce this Agreement, the prevailing party in such legal proceeding shall be awarded, in addition to such other relief as may be granted, attorneys' fees and costs incurred in connection with such proceeding, provided that if a party prevails only in part the court shall award fees and costs in accordance with the relative success of each party.

16. <u>Severability</u>.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

17. <u>Rights Cumulative</u>.  The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by either the Company or me (or by that party's successor), whether pursuant hereto, to any other agreement, or to law, shall not preclude or waive that party's right to exercise any or all other rights and remedies.  This Agreement will inure to the benefit of the Company and its successors and assigns.

18. <u>Nonwaiver</u>.  The failure of either the Company or me, whether purposeful or otherwise, to exercise in any instance any right, power or privilege under this Agreement or under law shall not constitute a waiver of any other right, power or privilege, nor of the same right, power or privilege in any other instance.  Any waiver by the Company or by me must be in writing and signed by either myself, if I am seeking to waive any of my rights under this Agreement, or by an officer of the Company (other than me) or some other person duly authorized by the Company.

19. <u>Notices</u>.  Any notice, request, consent or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if it is in writing, and shall be deemed given if and when it is hand delivered or sent by regular mail, with postage prepaid, to my residence (as noted in the Company's records), or to the Company's principal office, as the case may be, or when sent if sent by electronic mail or facsimile during normal business hours of the recipient and if not sent during normal business hours then on the recipient's next business day.  Any third party employing me, or otherwise utilizing my services or evidencing an intention to do so, during my Engagement or any period of restriction thereafter provided in this Agreement may be notified of the existence and provisions of this Agreement.

20. <u>Date of Effectiveness</u>.  This Agreement shall be deemed effective as of the commencement of my employment with or service to the Company.

21. <u>Agreement to Perform Necessary Acts</u>.  I agree to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

22. <u>Assignment</u>.  This Agreement may not be assigned by me without the Company's prior written consent.

23. <u>Compliance with Law</u>.  I agree to abide by all federal, state, and local laws, ordinances and regulations.

24. <u>Acknowledgment</u>.  I acknowledge that I have had the opportunity to consult legal counsel in regard to this Agreement, that I have read and understand this Agreement, that I am fully aware of its legal effect,

and that I have entered into it freely and voluntarily and based on my own judgment and not on any representations or promises other than those contained in this Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth below.

> CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S OR CONSULTANT'S RIGHTS TO INVENTIONS AND OTHER INTELLECTUAL PROPERTY THE EMPLOYEE OR CONSULTANT MAY DEVELOP DURING HIS OR HER EMPLOYMENT OR SERVICE.

Dated: __May____2nd_, 2017                    _Carl Vernon_____
                                              Name: Carl Vernon


Agreed and accepted:   May 1st, 2017

TORCHLIGHT TECHNOLOGY GROUP LLC

By: _____
Name:  Helene Seydoux
Title:   Managing Director

## EXHIBIT A

A.      Inventions made by me prior to my employment or service with the Company that I desire to be excepted from the Agreement to which this Exhibit A is attached (if none, write "NONE"):

AgendaMap

B.      Prior agreements to which I am a party that may interfere with full compliance with the Agreement to which this Exhibit A is attached (if none, write "NONE"):

SSRP Ventures
Cure Technologies

Dated:   May       2nd, 2017                 *Carl Vernon*

Name: Carl Vernon